**Opinion filed June 21, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-11-00232-CV

_____

## IN THE INTEREST OF M.N.M. AND W.J.M., CHILDREN

**On Appeal from the 70th District Court**

**Ector County, Texas**

**Trial Court Cause No. A-2977-PC**

## M E M O R A N D U M   O P I N I O N

This is an accelerated appeal of the trial court's order terminating parental rights. After a bench trial, the trial court terminated the parental rights of T.M. to her daughter, M.N.M., and to her son, W.J.M. The father, W.M., relinquished his parental rights to the two children, and the trial court also terminated his parental rights. He has not filed an appeal. The court appointed the Texas Department of Family and Protective Services (the Department) as the children's permanent managing conservator.

In a single issue, T.M. challenges the legal and factual sufficiency of the evidence supporting the trial court's findings that (1) T.M. had knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered their physical or emotional well-being, (2) T.M. had engaged in conduct or knowingly placed the children with persons who

engaged in conduct that endangered their physical or emotional well-being, and (3) termination was in the best interest of the children. We affirm.

*Background Facts*

Cyndi Perez was the Department investigator assigned to this case. Her affidavit was attached to the Department's petition. Perez was available to testify at trial, and her affidavit was introduced, without objection, into evidence as an exhibit. The attorneys stipulated that the affidavit would serve as the principal portion of her testimony. It provided a summary of the events leading to the Department's decision to seek a termination of parental rights and the bench trial.

T.M. and W.M. had separated. After the separation of T.M. and W.M. in April 2010, the children had resided primarily with their mother. On May 11, 2010, the Department received a referral (apparently from W.M.), alleging physical neglect of M.N.M. and W.J.M. by their mother. W.J.M. was seven months old, and M.N.M. was almost two years old. W.M. had taken the children to be examined by a doctor who found the children to be malnourished. Both children were treated for respiratory problems. According to the father, T.M. threw the children's medications away after he took the children back to her.

A month prior to the referral, W.M. had become aware that the children were ill; T.M. had not sought medical attention for them despite W.M. encouraging her to do so. W.M. took the children to a doctor who diagnosed W.J.M. as having an ear infection that had led to a sinus infection and then to "walking pneumonia." W.J.M. could not keep his food down and had lost over two pounds since the parents separated. M.N.M. had lost over five pounds during the same period.

On May 11, W.M. took possession of the children and saw that they were in poor condition. He delivered W.J.M. to his mother who lived in Gonzales; she immediately took W.J.M. to a doctor. Two days later, W.M.'s mother reported by telephone to a Department caseworker that the doctor had diagnosed W.J.M. as malnourished. The doctor also had observed that the back of the infant's head was flat, possibly from being left in a car seat too long. During that call, W.M.'s mother advised the caseworker that W.M. had been diagnosed as being bipolar and schizophrenic and that he could be very aggressive if he was not taking his medications as prescribed. She also made comments regarding T.M. and stated that she did not

2

believe that the children were safe in either parent's custody. On May 17, Perez received a call from a caseworker in Gonzales who confirmed that W.J.M. did appear to be malnourished.

From May 14 to June 2, Perez made a number of attempts to contact T.M. Messages were left on the door of the mobile home where T.M. was residing, and letters were sent to T.M. advising T.M. that she needed to contact Perez. Perez was trying to locate T.M. and M.N.M. On June 2, Perez learned that M.N.M. was with her father; Perez and another investigator met with W.M. and M.N.M. They observed that M.N.M. was obviously behind in her development: M.N.M. could not speak and walked only by holding on to something. Her hair was thin, her skin was pale white, her left foot was unstable, and her body was thin and lacked muscle tone. W.M. discussed with the investigators his difficulties in getting the children medical treatment because of T.M.'s refusal to provide him with their Medicaid cards and her refusal to administer medications the doctor had prescribed.

The parents agreed to voluntarily place M.N.M. with T.M.'s aunt. At that time, T.M. reported to the Department that W.M. had used cocaine and other controlled substances when they were together. In Perez's opinion, both parents had exhibited poor judgment regarding the care and safety of the children that had created precarious health situations for both children, including malnourishment, developmental delay, and lack of medical treatment leading to dangerous respiratory conditions. Perez concluded that the mother had been unconcerned about the children and had failed to provide them with adequate nutrition and stimulation for their proper growth and development. Neither parent had demonstrated an ability to provide stable housing or employment to provide for themselves.

At the bench trial, the Department called eight witnesses. In rebuttal, T.M. testified. During final arguments, the guardian ad litem stated to the court that he believed there were sufficient grounds to support a termination of parental rights. In the Order of Termination, the trial court found by clear and convincing evidence that termination of the parent-child relationship between T.M. and her two children was in the best interest of the children and that T.M. had (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children.

3

*Standards of Review*

Due process requires that the grounds for termination be established by clear and convincing evidence. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *In re D.O.*, 338 S.W.3d 29, 33 (Tex. App.—Eastland 2011, no pet.). This requires a measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2008); *In re J.P.H.*, 196 S.W.3d 289, 292 (Tex. App.—Eastland 2006, no pet.).

When conducting a legal sufficiency review, we review all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005); *In re J.F.C.*, 96 S.W.3d at 266; *In re J.P.H.*, 196 S.W.3d at 292. We must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *In re J.F.C.*, 96 S.W.3d at 266.

When conducting a factual sufficiency review, we review the record as a whole, including evidence in support of and contrary to the judgment, and give due consideration to evidence that the trier of fact could have found to be clear and convincing. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002); *In re J.P.H.*, 196 S.W.3d at 292–93. We then determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations. *In re C.H.*, 89 S.W.3d at 25; *In re J.P.H.*, 196 S.W.3d at 293. We also consider whether any disputed evidence is such that a reasonable factfinder could not have resolved that evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266; *In re J.P.H.*, 196 S.W.3d at 293.

To terminate parental rights, the Department must prove that one statutory ground for termination has occurred and that termination is in the best interest of the child. *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). One ground for termination is that a parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D) (West Supp. 2011). Another ground for termination is that a parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." *Id.* § 161.001(1)(E).

"Endanger" means to expose to loss or injury or to jeopardize a child's emotional or physical health. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *Phillips v. Tex. Dep't of Protective & Regulatory Servs.*, 149 S.W.3d 814, 817 (Tex. App.—Eastland 2004, no pet.); *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied). The conduct must be more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment. However, it is not necessary that the conduct be directed at the child or that the child actually suffers injury. *Doyle*, 16 S.W.3d at 394. The cause of danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omissions or failures to act. *Doyle*, 16 S.W.3d at 395; *In re S.H.A.*, 728 S.W.2d 73, 85 (Tex. App.—Dallas 1987, writ ref'd n.r.e). Termination must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied); *In re K.M.M.*, 993 S.W.2d 225, 228 (Tex. App.—Eastland 1999, no pet.).

Under Section 161.001(1)(D), it is necessary to examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *In re D.T.*, 34 S.W.3d 625, 632 (Tex. App.—Fort Worth 2000, pet. denied). A child is endangered when the environment creates a potential for danger that the parent is aware of but disregards. *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *see In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Under Section 161.001(1)(E), the relevant inquiry is whether evidence exists that the endangerment of the child's physical or emotional well-being was the direct result of the parent's conduct, including acts, omissions, and failures to act. *In re M.R.J.M.*, 280 S.W.3d at 502. As mentioned, a voluntary, deliberate, and conscious course of conduct by the parent is required for termination. *Id.*

In addition to proving that one statutory ground for termination has occurred, the Department must prove that termination is in the best interest of the child. *In re J.L.*, 163 S.W.3d at 84; *In re A.V.*, 113 S.W.3d at 362; *see* TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2011). The focus is on the child's best interest, not that of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). No unique set of

factors need be proved. *In re C.J.O.*, 325 S.W.3d 261, 266 (Tex. App.—Eastland 2010, pet. denied). But courts may use the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These include, but are not limited to, (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. *Id*. Additionally, evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *In re C.J.O.*, 325 S.W.3d at 266. A trier of fact may measure a parent's future conduct by his or her past conduct and determine that it is in the child's best interest to terminate parental rights. *In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.).

*Are T.M.'s Issues Precluded From Review?*

As a preliminary matter, the Department contends that T.M.'s issues are precluded from review because she failed to file her statement of points within the fifteen-day extension period as provided in former Texas Family Code Section 263.405.[1] The record shows that T.M. failed to timely file a statement of points for appeal as required by former Section 263.405(b). The Department asserts, therefore, that we may not consider T.M.'s issues. *See* former Section 263.405(i) (Providing that an "appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of the points"). The Texas Supreme Court has held, however, that former Section 263.405(i) "is unconstitutional as applied when it precludes a parent from raising a meritorious complaint about the insufficiency of the evidence supporting the termination order." *In re J.O.A.*, 283 S.W.3d 336, 339 (Tex. 2009). In light of *J.O.A.*, we will address T.M.'s challenges to the sufficiency of the evidence.

---

[1]Former TEX. FAM. Code § 263.405 (2007) was amended in part and repealed in part. *See* Act of May 5, 2011, 82d Leg., R.S., ch. 75, §§ 4, 5, 8, 2011 Tex. Gen. Laws 348, 349. The more recently revised provisions of Section 263.405 apply only to termination orders signed on or after September 1, 2011. The former law was continued for orders signed prior to that date. *Id.*

*Analysis*

T.M. complains that the evidence was legally and factually insufficient to support the trial court's order terminating T.M.'s parental rights because the Department's primary concern was T.M.'s poverty; because there was no evidence of drug use, violence, criminal history, mental health issues, or inability to maintain a home or provide food; and because T.M. complied with the court's orders. We disagree with T.M.'s summary and analysis of the evidence. The record reflects that the Department had a number of concerns, including whether T.M. could keep a job, provide a stable home and proper food for the children, and attend to the children's developmental needs.

The testimony of Perez, the Department's investigator, was confirmed by the other witnesses for the Department. W.M. testified that he signed his rights over because he "felt like the kids would be better with Barbara and Billy [Heath] than anybody else" and that their adoption of the children would be in the children's best interest. He testified that T.M. was not stable and that "[h]er emotions [were] always flowing in the wrong direction." He discussed T.M.'s refusal to provide him with the children's Medicaid cards despite the fact that the children had been throwing up for months. He made T.M. take him and the children to the doctor; however, she did not go in with them to see the doctor. W.M. gave T.M. the medicine prescribed by the doctor; however, she sent him a message that she had thrown the medicine away.

W.M. explained why he had taken the baby, W.J.M., to his mother. T.M. brought W.J.M. to W.M. one day and said that "she couldn't stand the little bastard anymore." W.M. called his mother, and his mother picked up W.J.M. and took him to a doctor in Gonzales where W.J.M. was diagnosed as being malnourished. Later, T.M. brought M.N.M. to W.M., and W.M. saw that the child was not walking very well and was "real thin." W.M. testified about his difficulty in getting to see the children while they were living with T.M. at her boyfriend's house. At some point, the children were "being left [by T.M.] at Ms. Bell's house," and he attempted to have the police help him check on the children. Apparently, W.M. contacted the Department because he subsequently testified that Perez became involved. W.M. and T.M. agreed with Perez that the children should be placed with the Heaths. W.M. has visited the children once or twice a week since they were placed with the Heaths. In the Heaths' home, the children have recovered their health, and they are now happy and talking.

7

Dr. Mary Beth Hart, an assistant professor of pediatrics with Texas Tech University, testified that she has been seeing the two children for one and one-half years. Her diagnosis of M.N.M. had been "failure to thrive," due to lack of food or illness; M.N.M. was not proceeding in her development as she should have been compared with her age group. Dr. Hart said that she had discussed with the father M.N.M.'s failure to thrive. She testified that their father brought them in regularly and that she saw T.M. with the children on only one visit. Dr. Hart has continued to see the children since their placement with the Heaths. The children's condition has improved, and they have progressed in their development. W.J.M. has progressed from the low fifth percentile to the twenty-fifth percentile to the fiftieth percentile.

Barbara Heath testified that M.N.M. began residing in the Heaths' home in June 2010; M.N.M. was twenty-three months old at the time. She described M.N.M. as being underweight and pale, barely walking, and saying very few words. Heath took M.N.M. to the emergency room the next day because M.N.M. had an upper respiratory infection and a high fever. Heath contacted Early Childhood Intervention for an evaluation, and ECI began providing services to M.N.M. M.N.M. has improved in her walking and in her speech; however, she is still behind in development. M.N.M. has also gained weight and become healthy.

Heath said that W.J.M. began residing in their home in October 2010. W.J.M. was throwing up. They took W.J.M. to a specialist who diagnosed W.J.M. as having acid reflux. W.J.M. was in better health than M.N.M. was when she arrived because he had been living with his paternal grandmother in Gonzales for about six months and she had helped him gain weight and develop. Heath testified that T.M. had not been to visit the children for over three months. She had seen T.M. during visits at the Department. She and T.M. would visit while the children were at the Department. Heath testified that she and her husband wanted to adopt the children because she believed that would be in the children's best interest. She testified that the children needed stability and a good environment and that the Heaths would provide stability and a good environment.

Joanna Hatley, an ECI specialist, testified that she was working with M.N.M. and W.J.M. M.N.M. was three at the time of trial, and W.J.M. was twenty-one months old. Hatley discussed how she has helped the children in their physical development and has helped Heath with the nutritional needs of the children. When Hatley started M.N.M on the ECI program July 1, 2010, M.N.M. was eleven months behind in her walking and gross motor skills; she was in the fifth

percentile. Hatley expressed her opinion that T.M. had not worked with M.N.M. Hatley discussed what she and Heath had done in response to the doctor's diagnosis of M.N.M. as "failure to thrive." Hatley explained that "failure to thrive" simply meant malnutrition: that a child was not getting enough food. According to Hatley, M.N.M. has made substantial progress and is no longer malnourished. Hatley also expressed her opinion that M.N.M. was behind in her development due to neglect.

Hatley testified that she had noticed that M.N.M.'s head is misshapen and that, after eighteen months and two years of age, the head of a child cannot be changed. M.N.M.'s head is a bit flat on one side, which indicates that she was left lying in one position too long. When younger than eighteen months, children often are not able to get up and move around as they should.

ECI was also providing services to W.J.M., who was behind in developing his adaptive and self-help skills when he moved to the Heaths' home. She also testified that W.J.M. had trouble in calming himself when he arrived.

Connie Mudd, a speech therapist with ECI, testified that she had worked with M.N.M. during the past year and that W.J.M. also participated in the therapy. She found that M.N.M. had no neurological reason for being behind in her speech but stated that speech developmental delay is often caused by the child "being deprived of experiences, not being taken out, not playing with other children, just being planted in front of the TV." Mudd said that M.N.M. was just hungry for attention. Mudd said that she would call Heath to tell Heath that she was coming and that, when she arrived, M.N.M. would be sitting at the table ready to work with Mudd.

Kirsten Stringer provides occupational therapy for ECI. She worked with W.J.M. to address coordination issues, sensory processing problems, and staying on task. W.J.M. had a sensory problem. It would appear that he had temper tantrums. He had a difficult time staying focused and would throw himself down on the floor and hit his head. But Stringer discovered that his body was seeking input. W.J.M. was beating his head trying to gain input to help organize his sensory system, after which he was able to concentrate on what he needed to do. The instances would appear to be a temper tantrum, but they were not always from anger. Stringer explained that his behavior could have been from neglect and from being left in a baby seat too long. Stringer said that they often see similar behavior in babies that have been left in

one area and not played with. Stringer testified that she and Heath had given W.J.M. joint compressions to his body and that the technique had helped him.

Stringer discussed how W.J.M. initially could not sit down and play for any length of time. His actions were not normal for a one-year-old. She and Heath had worked with W.J.M. in that area to help him develop attention-to-task skills. In addition, W.J.M. needed help in learning how to eat with a spoon and in learning other self-care skills.

Stringer noticed at the beginning that W.J.M. had a flat head, stating that most of the time that indicated that the child had been left in one particular position for an extended length of time. When a child is left in a certain position for a long period of time, their young heads conform to that position. Stringer testified that it was too late to change W.J.M.'s head shape when she started working with him. Stringer was very complimentary in discussing Heath's efforts with W.J.M. She stated that W.J.M. had made substantial progress in all areas of development.

Samantha Sanchez was the Department's caseworker for the children for over a year. Sanchez testified that her major concerns were that T.M. had not maintained a stable home or a stable job. Sanchez said that T.M. had completed the service plan but had not implemented those lessons into her lifestyle. T.M. failed to demonstrate that she had changed. In Sanchez's opinion, T.M. had failed to acknowledge that the children were not healthy and that they were not developing. Sanchez discussed with T.M. that the service plan required her to demonstrate a willingness and ability to protect the children from harm; however, T.M. blamed her situation on others and her environmental surroundings.

Sanchez testified that T.M. had first worked at Dollar General and then worked at the Palms Apartments as a manager. Sanchez did not know why T.M. left the Palms Apartments job, but she knew that T.M. then worked at Smokers Outlet. However, it was Sanchez's under-standing that T.M. was unemployed at the time of trial.

Sanchez explained that T.M. had weekly contact with her children at the Department's office and that the visits had gone well. The only issue that the Department had with T.M. was that T.M. would often forget to change diapers. The visits were one hour each time. In Sanchez's opinion, T.M. had not demonstrated an acceptance of the responsibility of being a parent.

Sanchez testified that, when the Department removed the children, T.M. was living in a trailer with her boyfriend or friend and his father. At one point, T.M. and the children had lived with her mother. Sanchez said that the Department would not recommend that living arrangement because T.M.'s mother had not seen or acknowledged that the children were undernourished and not doing well physically.

Sanchez concluded by stating that the Department's recommendation that T.M.'s parental rights be terminated was based on the individual recommendations of everyone who had worked with T.M. Sanchez and the Department personnel would be concerned for the children's safety if the children went back to live with T.M. Sanchez admitted that all of T.M.'s drug tests were negative. Sanchez discussed her opinion that the children's physical and emotional well-being had been in danger when living with their parents. She testified that putting them back into an environment with T.M. could lead to the same problems again. Although T.M. had worked, her income was only sufficient to support herself; it was not sufficient to support her and her children. Sanchez emphasized the importance of the children's continued requirement for speech and mental therapy services and stressed that a parent had to continue working with them as the Heaths had.

T.M. testified that she was currently living with her mother in a three-bedroom trailer house. T.M.'s sister and the sister's daughter also lived there. She requested that the court return the children to live with her at her mother's home. She claimed that she had given the children the medicine that W.M. had given to her and that she had then thrown the remaining medicine away. She denied that she had ever failed to change the children's diapers. T.M. said that she still worked at the Palms Apartments for five or ten hours a week at $9.00 per hour and that she had taken another job at Auto Zone for twenty-five to thirty hours a week at $8.22 per hour. T.M. related what she had learned about parenting, especially in the Project Adam class she had taken. She stated that she was continuing to take classes. T.M. acknowledged that she had not been to the Heaths' home in three months because of working two jobs, but she pointed out that she had visited with the children each week at the Department. T.M. also said that she had a good relationship with the Heaths.

In closing statements, the guardian ad litem for the children stated that he believed there was sufficient evidence for a termination of T.M.'s parental rights. The children were in danger when they were taken from their mother; she did not perceive the danger that should have been

obvious to her. He further stated that the stability the children have with the Heaths is very important to them.

These children were neglected when they were the most vulnerable: M.N.M. was three years old at the time of trial, and W.J.M. was twenty-one months old. It is fortunate that W.M. contacted the Department for help when he did. While the children continued to reside with their mother, their father recognized that the children needed medical attention. T.M. did not recognize their health problems and refused to provide him with their Medicaid cards. Neither T.M. nor her mother recognized that the children were malnourished. T.M. is to be commended for working and for completing the Department's service plan, but it appears that she has not been able to take the parenting lessons and put them into practice. Sanchez testified that the recommendations by the Department personnel, based on their own observations and on reports by ECI personnel, were that T.M.'s parental rights should be terminated.

There was testimony that both parents had exhibited poor judgment regarding the care and safety of the children, thereby creating dangers to their health and well-being. The children's misshapen heads were noted by the doctors and the caseworkers. All opined that their flat heads were due to being left in one position too long. The mother allowed the father to have unsupervised possession of the children despite knowing of his mental health problems and aggressive behavior if he failed to take his medications. And the father allowed the children to remain in an unstable environment with their mother despite knowing that the children needed medical attention. Prior to the Department becoming involved, the children suffered from malnourishment, developmental delay, and lack of medical treatment that had led to serious respiratory illnesses. T.M. failed to provide adequate nutrition and stimulation to the children for their proper growth and development. A factfinder may infer from past conduct endangering a child's well-being that similar conduct will recur if the child is returned to the parent. *In re M.R.J.M.*, 280 S.W.3d at 502.

The evidence was legally and factually sufficient to support the trial court's findings that T.M. (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings that endangered the physical or emotional well-being of the children and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children.

Having reviewed the evidence in the light most favorable to the best interest finding under the *Holley* factors, we hold that the trial court could have formed a firm belief or conviction that terminating appellant's parental rights was in the best interest of M.N.M. and W.J.M. The record reflected that the children had made substantial progress in their development and return to health while in the Heaths' home. We hold that the evidence was legally and factually sufficient to support the trial court's termination of the parental rights of T.M. as being in the best interest of M.N.M. and W.J.M. T.M.'s sole issue on appeal is overruled.

*This Court's Ruling*

The order of the trial court is affirmed.


TERRY McCALL

JUSTICE


June 21, 2012

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.